# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF PENNSYLVANIA

THE VALSPAR CORPORATION,     )
    )
            Plaintiff,     )     <u>Civil Action No. 12-095</u>
    )
    )
    v.     )
    )
    )
THOMAS A. VAN KUREN,     )
    )
            Defendant.     )

## <u>MEMORANDUM OPINION</u>

CONTI, District Judge.

On May 1, 2012, following an evidentiary hearing, the court issued a preliminary injunction in this civil action, which involves allegations of misappropriation of trade secrets. (ECF No. 71.) The court made findings on the record and advised that the court would issue an opinion which would more fully explain the reasons for the court's decision. This is the opinion which sets forth the findings of fact and conclusions of law to explain those reasons in writing.

## I. Findings of Fact

### A. Procedural History

1. On January 26, 2012, The Valspar Corporation ("Valspar" or "plaintiff") filed a complaint against its former employee Thomas Van Kuren ("Van Kuren" or "defendant") alleging misappropriation of trade secrets in violation of Pennsylvania statutory trade secret law, 12 PA. CONS. STAT. § 5301, *et seq.* (Compl. (ECF No. 1).)

2. On January 27, 2012, Valspar filed a motion for a temporary restraining order

("TRO") and preliminary injunction.  (ECF No. 5.)  Valspar sought to enjoin Van Kuren from beginning work at its competitor, Watson Standard Company ("Watson Standard"), or from otherwise disclosing any trade secrets.  (Id.)

3.     On February 1, 2012, the court held a hearing on the motion for a TRO.  The court denied the motion as moot because the parties consented to the entry of a TRO, which the court entered.  (See ECF No. 15.)  Under the TRO, the parties agreed that Van Kuren would be required to return all confidential information to Valspar he had obtained during the course of his employment at Valspar, and would be enjoined from (a) using or disclosing Valspar's trade secrets (or other proprietary or confidential information) and (b) failing to preserve any evidence relating to this case.  (Id.)  At the hearing, the court set dates for expedited preliminary discovery, and scheduled a hearing on the motion for a preliminary injunction.

4.     At one of the hearings resolving discovery disputes, because plaintiff identified in its prehearing statement more than twenty trade secrets and general "categories of trade secret information" at issue in the preliminary injunction hearing (see Valspar's Am. Pre-Hearing Statement (ECF No. 42) at 5-6) and in light of the equitable nature of preliminary injunctions, the court ordered Valspar to identify five trade secrets which would be at issue during the preliminary injunction stage of the proceedings.  (Hr'g Tr. Feb. 27, 2012 ("2/27 Transcript") (ECF No. 50) at 10-11.)

5.     On the court's initiative, the parties filed a joint motion for the appointment of Frank N. Jones, Ph.D., as the technical advisor to the court on March 2, 2012.  (ECF No. 54.) The court granted that motion in an order dated March 5, 2012.  (ECF No. 58.)

6.     On March 5, 2012, the parties stipulated to the trade secrets which would be at issue in the preliminary injunction hearing.  The parties restricted the scope of the preliminary

injunction hearing to only four trade secrets, one fewer than the number authorized by the court. (ECF No. 59.) The four trade secrets are addressed below in Part I.C of this opinion.

7.      The court held a hearing on the motion for a preliminary injunction over several days on March 6, 2012, March 7, 2012, April 9, 2012, April 11, 2012, April 12, 2012, and April 18, 2012.[1]

8.      At the conclusion of the April 18, 2012 hearing, the court ordered the parties to submit proposed findings of fact and conclusions of law, which each filed on April 23, 2012. (ECF Nos. 67 & 68.)

9.      The court held a conference on April 27, 2012, informed the parties that the motion for a preliminary injunction would be granted if the parties could not amicably resolve the dispute before 5:00 p.m. on May 1, 2012, and explained why the motion would be granted.

10.     No settlement was reached and on May 1, 2012, the court entered an order (with this opinion to follow) granting the motion for a preliminary injunction in part. (ECF No. 71.) The court enjoined defendant from "(a) continuing employment with Watson Standard, (b) accepting wages or other compensation from Watson Standard, or (c) performing any services for or on behalf of Watson Standard." (Id.) The court enjoined Van Kuren from disclosing or using any of Valspar's trade secrets or other proprietary or confidential information. (Id.) The preliminary injunction included a provision requiring Valspar to make monthly payments to Van Kuren in an amount equivalent to the salary and benefits he would have received from Watson Standard. (Id.) These payments were ordered to continue so long as the injunction is in effect. (Id.) The preliminary injunction is to remain in effect unless and until modified by a court order or until a final judgment is entered in the case. (Id.)

---

[1] The delay in the proceedings was due, at least in part, to the good faith attempt of the parties to resolve this dispute outside of court, and to the devotion of an entire day (previously set aside for the preliminary injunction hearing) to mediation before the court.

11.     This opinion more fully sets forth in writing the court's reasons for entering the preliminary injunction, which were orally made on the record on April 27, 2012.

## B.  The Parties

12.     Valspar is a publicly traded company, incorporated in Delaware, which maintains its principal place of business in Minneapolis, Minnesota.  (Compl. (ECF No. 1) at 3; Hr'g Tr. Apr. 11, 2012 ("4/11 Transcript") (ECF No. 80) at 59.)  According to Valspar's 2011 Form 10-K disclosure, filed with the United States Securities and Exchange Commission:

> [Valspar] is a leading global coatings and paints manufacturer and distributor, based on revenues and trade publication rankings. [Valspar] manufacture[s] and distribute[s] a broad portfolio of coatings, paints and related products.  [Valspar] operate[s] [its] business in two reportable segments: Coatings and Paints. . . .

(The Valspar Corporation, 2011 Form 10-K (ECF No. 51-1) at 4.)  The value of Valspar's total net sales in 2011 was $3.95 billion.  (Id.)  Valspar employs approximately 10,000 employees and maintains manufacturing plants in more than fifteen countries.  (Id. at 6.)  In its Form 10-K, Valspar provided that its "knowledge and trade secret information regarding [its] manufacturing processes and materials have . . . been important in maintaining [its] competitive position" and that it "require[s] employees to sign confidentiality agreements relating to proprietary information."  (Id. at 5.)

13.     At the time of the hearing, Van Kuren was fifty-three years old; he is married and has one child, aged five.  (Van Kuren Declaration, Hr'g Ex. P-1, ¶¶ 1-2.)  He is a chemist and former employee of Valspar at its facilities in Pittsburgh, Pennsylvania.  (Thomas Van Kuren Resume, Hr'g Ex. P-14.)  He resides in Mars, Pennsylvania.  (Id.)  Van Kuren began working for Valspar in 1994.  (Id.)  Until 2006, he had worked as a technical manager or group leader in various groups within Valspar—with the exception of a one-year term in 2001 when he was

Valspar's liaison to a joint venture it conducted in Japan. (Id.; Hr'g Tr. March 6, 2012 ("3/6

Transcript") (ECF No. 77) at 248-53.) Beginning in 2006, Van Kuren worked as a technical

manager for the beverage ends[2] group at Valspar. (Id.) He remained in that position until he left

the company in January 2012. (Id.) Van Kuren resigned from Valspar on January 3, 2012 to

commence employment as a technical director at Watson Standard. (Hr'g Tr. Apr. 9, 2012 ("4/9

Transcript") (ECF No. 79) at 85.)

   14. Watson Standard,[3] according to its president, James Lore ("Lore"), "is a privately

held specialty coatings and adhesives manufacturer, headquartered in Pittsburgh, Pennsylvania

[that] specializes in formulating and providing application based, customer specific conventional

solvent based and energy curable coatings, adhesives and related products for the rigid, flexible,

pharmaceutical and general packaging industries." (Lore Declaration, Hr'g Ex. P-25, ¶ 2.)

Watson Standard is substantially smaller than Valspar with revenues not exceeding $50 million,[4]

but competes in many of the same areas of the coatings business. (Hr'g Tr. Mar. 7, 2012 ("3/7

Transcript") (ECF No. 78) at 9-13.) Watson Standard recently made both internal and external

announcements that it is aggressively attempting to grow. (Id. at 5-6) Although the company

does not currently sell coatings for the interior and exterior of beverage ends,[5] it is in customer

trials for those products and hopes to be in the market soon. (Id. at 12-13, 16-17.)

---

[2] Beverage ends are the tops of soda and beer cans, where the flip top, or pull tab, is found. (3/6 Transcript (ECF No. 77) at 191.)
[3] Although not a party to this suit, Watson Standard participated in this litigation and was represented by counsel during the preliminary injunction hearing. Counsel for Watson Standard entered his appearance on the docket on behalf of both Watson Standard and Van Kuren.
[4] In making this finding, the court relies Watson Standard's representations and an in camera review of Watson Standard's financial records. (See Minute Entry, March 5, 2012.)
[5] Watson currently sells coatings only for the "tab stock." (3/7 Transcript (ECF No. 78) at 12.) Tab stock is the metal from which the pull tabs on aluminum cans are made. (3/6 Transcript (ECF No. 77) at 153.)

### C. The State of the Coatings Industry

15.     The coatings manufactured by Valspar and Watson Standard are chemical substances similar to paints that are sprayed or rolled onto interior or exterior surfaces of containers in order to impart certain desirable qualities to those surfaces. (3/6 Transcript (ECF No. 77) at 86-92, 181-83.)  Coatings have two basic components—(a) a volatile liquid solvent or carrier portion, and (b) a coating material portion. (Id. at 181-82.)  After application of the coating, the liquid solvent portion is removed by evaporation and the residue is usually subject to some form of curing (as explained below), leaving behind the coating material on the intended surface. (Id.)  Coatings are used to treat containers for a wide variety of consumer products, including aerosol spray cans, pill containers, food and beverage cans, bottle caps and jar lids, chewing gum packages and tobacco tins. (Id. at 86-92; 4/11 Transcript (ECF No. 80) at 30.)

16.     A primary purpose of can coatings is to adhere to a container in order to prevent corrosion or deterioration of the container. (4/9 Transcript (ECF No. 79) at 18.)  A coating, for example, may protect a metal can from deterioration that can be caused by its contents. (Id.)  Coatings manufacturers typically create application-specific coatings for different kinds of containers. (See 4/11 Transcript (ECF No. 80) at 30.)  There are a variety of reasons necessitating development of application-specific coatings.  Different kinds of food, with varying acidity and fat-content among other qualities, require coatings with different specifications to prevent corrosion. (Hr'g Tr. Apr. 12, 2012 ("4/12 Transcript") (ECF No. 98) at 22-23.)  At the same time, the container-manufacturing and coating-application process may require a coating to have specific characteristics, such as sufficient flexibility to withstand stretching and maintain its anti-corrosive properties. (4/9 Transcript (ECF No. 79) at 52-54.)  Flexibility is especially an issue when the coating is applied to metal before the metal is formed into the shape of the

container.  (Id.)  The fitness or ability to be applied at high speeds on spray and coil lines is also crucial.  (3/6 Transcript (ECF No. 77) at 121; 3/7 Transcript (ECF No. 78) at 124; 4/9 Transcript (ECF No. 79) at 43-44; 4/12 Transcript (ECF No. 98) at 66-67.)

17.     The coatings for light metal packages contain base materials known as polymers. (3/6 Transcript (ECF No. 77) at 181-82.)  These base polymers have historically included epoxies, which contain Bisphenol-A ("BPA"); polyesters; vinyls; and acrylics.  (Id.)  Other ingredients are added to the base polymers to give a coating its full range of properties.  (Id.) After application on the intended surface, the coatings are "cured" or dried on the metal in ovens or by other means, such as ultraviolet light or electron beam.  (Id. at 182-83.)

18.     Epoxies containing BPA provide excellent corrosion resistance, but there are new concerns that BPA may be unsafe and may cause health problems to humans exposed to it.  (4/9 Transcript (ECF No. 79) at 42-43.)  For that reason, customers in the industry (i.e., the manufacturers of the containers and the producers of the products within the containers) are increasingly demanding that companies like Valspar and Watson Standard make BPA-free coatings; as a result, there is a race among coatings manufacturers to develop BPA-free coatings. (3/6 Transcript (ECF No. 77) at 163, 236; 3/7 Transcript (ECF No. 78) at 41; 4/9 Transcript (ECF No. 79) at 42-44.)  Customers also prefer water-based technologies, which may be less expensive, safer and more efficient.  (4/9 Transcript (ECF No. 43) at 42-44.)

19.     Development of water-based non-BPA coatings is a top priority at both Watson Standard and Valspar.  (3/6 Transcript (ECF No. 77) at 162-64; 3/7 Transcript (ECF No. 78) at 64.)  Valspar considers development of non-BPA technology to be the most important project within its entire research portfolio.  (3/7 Transcript (ECF No. 78) at 64.)  It invested $35 million into the production of non-BPA technology over the past three years.  (Id. at 74.)  Richard

Mysliwczyk ("Mysliwczyk"), formerly the technical director and later a regulatory officer at Watson Standard, retired in January 2012. (3/6 Transcript (ECF No. 77) at 147-148.) He testified that development of non-BPA products was "one of the higher priority projects" and "a primary effort" at Watson Standard. (Id. at 162-64.)

20. Valspar and Watson Standard are two competitors who make can coatings. (4/11 Transcript (ECF No. 80) at 59-60.) There are other competitors, such as PPG Industries, Inc. and Akzo Nobel N.V., which along with Valspar, are primary competitors in the can coatings market. (Id.) There are also other companies that, like Watson Standard, compete on smaller scale. (Lore Declaration, Hr'g Ex. P-25, ¶ 7.) According to Lore, Watson Standard, which is much smaller than the three primary coatings producers, cannot compete with them "on price." (4/11 Transcript (ECF No. 80) at 60.) In order to compete, rather, Watson Standard's "products have to be better." (Id.)

21. In the coatings industry, "there really is very limited growth, probably one to two percent a year. So . . . the only way you're going to grow is by buying somebody or taking business away from somebody else." (4/12 Transcript (ECF No. 98) at 28.) To grow, a company must either beat its competitors' prices, increase the output capacity of its production in order to pursue high volume opportunities with economies of scale, or develop new and novel technologies. (3/6 Transcript (ECF No. 77) at 161; Hr'g Tr. Apr. 18, 2012 ("4/18 Transcript") (ECF No.81) at 61.)

### D. The Four Trade Secrets

22. For the purposes of this preliminary injunction hearing, there are four Valspar trade secrets at issue. The first trade secret is a research endeavor known within Valspar as "Project 71." The final three trade secrets involve various other proprietary formulas—all of

which Van Kuren accessed on November 23, 2012—for coatings or composite parts of coatings. For the purposes of this opinion, those three trade secrets will be referred to as the "non-Project 71 trade secrets" while all four trade secrets (including Project 71) will collectively be referred to as the "four trade secrets." Each of the four trade secrets is discussed below.

23.     Project 71 is Valspar's effort to develop a water-borne, BPA-free technology by expanding upon and combining its previously developed technologies. (3/6 Transcript (ECF No. 77) at 185-194, 197.)   The initial goal for Project 71 was to develop non-BPA coatings for use in beverage ends. (Id. at 189.) The ultimate goal, however, for Project 71 is to create non-BPA formulas which could be tweaked for use in a wide variety of applications. (Id. at 189, 194-97.) Project 71 technology has potential applications as a water-borne non-BPA technology in areas outside of beverage ends. (Id.) The Project 71 formulation has not changed significantly since Van Kuren's departure from Valspar. (Id. at 189.) Project 71 is currently in customer trials, and may be marketable soon. (4/9 Transcript (ECF No. 43) at 63-64.)

24.     As will be explained more fully below, Van Kuren had a leadership role in the advancement and development of Project 71 in late 2011, at the same time he secretly agreed to leave Valspar and begin working at Watson Standard; Van Kuren has detailed knowledge of the Project 71 technology. (Id. at 44-46; 3/6 Transcript (ECF No. 77) at 180, 187-89.)

25.     The non-Project 71 trade secrets include: (a) two non-BPA formulas for roll on pilfer-proof ("ROPP") closures—the types of closures used in twist-off wine bottles (Id. at 100-101, 107; OPTIVA Access Log, Hr'g Exs. 7, 42); and (b) a formulation for an ultraviolet-cured coating typically used for the outside of aerosol cans (3/6 Transcript (ECF No. 77) at 100, 111; OPTIVA Access Log, Hr'g Exs. 7, 42). Van Kuren briefly accessed these formulas in Valspar's proprietary database (which contains its formulations) during the afternoon of November 23,

2011, the day before Thanksgiving.  (3/6 Transcript (ECF No. 77) at 100, 111; OPTIVA Access Log, Hearing Exhibits 7, 42.)

26.     Watson Standard sells ROPP closures.  (3/6 Transcript (ECF No. 77) at 108.) Ultraviolet-cured coatings are one of Watson Standard's areas of specialty.  (Id. at 11.)

27.     Van Kuren admitted that the four formulations at issue are trade secrets.  (3/7 Transcript (ECF No. 78) at 152.)

### E.  Van Kuren's Abilities and Involvement in Project 71 at Valspar

28.     Van Kuren was considered by his supervisors at Valspar to be an "expert formulator":

> [W]hen we're talking about formulation, that's the product. It's a combination of a lot of different components that go into a coating, the solvents, the polymer, the resin system, and then other special additives; and the formulation expert is somebody that has a lot of experience in putting together those components, knowing and understanding what each of those components do, you know, what -- what do they really contribute to the final formulation. So it's an assembly of a lot of different components to make a final product.
>
> And that what's we call a formulator. And knowing how to combine them and in what ratios and what levels, what has worked before, those types of things, that's how you get to be an expert, having a lot of background, a lot of knowledge, a lot of experience, and a lot of problem solving experience, for example. That's what an expert formulator really does.

(4/9 Transcript (ECF No. 79) at 8-9, 32-33.)  Van Kuren has broad formulating knowledge in many areas of Valspar's business.  (Id. at 25.)   Van Kuren's colleagues rated him highly as a formulator.  (3/6 Transcript (ECF No. 77) at 120.)   David Santure ("Santure"), the technical director at Valspar and Van Kuren's immediate supervisor, described him as "being a very competitive, a very tenacious formulator and chemist."  (4/9 Transcript (ECF No. 79) at 49.)

29.     Before his resignation, Van Kuren had a managerial role in Project 71 because he

managed the beverage ends group (as is explained above, Project 71 was developed for use in beverage ends).  (3/6 Transcript (ECF No. 77) at 185; 4/9 Transcript (ECF No. 79) at 40-41.) According to Santure, after the failure of Project 71's predecessor research endeavor (known as "Project 1"), "we ha[d] to go back and we had to develop something even quicker [which is why] you want your best people on it, and that's why we put Tom Van Kuren on it."  (4/9 Transcript (ECF No. 79) at 40-41, 46.)  Project 71 had a very tight development time frame.  (3/6 Transcript (ECF No. 77) at 188.)  Valspar intended to submit a Project 71 product to customers by Christmas 2011, and as the deadline approached, development ramped up and meetings became more frequent.  (Id. at 188.)

30.     Van Kuren's knowledge of Project 71 was "very in depth."  (4/9 Transcript (ECF No. 79) at 44.)  Santure and Van Kuren discussed Project 71 multiple times per day during the last months of 2011.  (Id. at 45-46.)  Jeff Niederst ("Niederst"), a research scientist at Valspar who led (and still leads) the polymer development aspect of Project 71, met with Van Kuren three-to-five times per week in late 2011, continuing through December 2011.  (3/6 Transcript (ECF No. 77) at 180, 187-88.)  Van Kuren was very detail-oriented in his management of Project 71, and his knowledge was as specific as the lead formulator's knowledge might be.  (Id. at 189.) "That means he knew very well the details of the materials that were used in the formulation, the levels, the results, and the direction in which the results were leading the development."  (Id. at 189.)

31.     Van Kuren does not know all specific details of the formulation for Project 71, but he knows substantial and highly important aspects of the trade secret; as of March 6, 2012, the formulation for Project 71 had not changed in any meaningful way since Van Kuren left Valspar.  (Id.; 3/7 Transcript (ECF No. 78) at 152, 156-57.)

32.     Van Kuren demonstrated his knowledge of Project 71 by testifying in detail about some of the specifics of the technology at the preliminary injunction hearing.  (See, e.g., 3/7 Transcript (ECF No. 78) at 145-151.)  For example, he criticized much of Niederst's testimony relating to Project 71:

> Q:     . . . All right.  Sir, there's a schematic up there.  You were here in the courtroom yesterday that Mr. Niederst Drew that; do you see that?  This is a family tree of Project 71, correct?
>
> A:     You could call it that, yes.  It's a very oversimplification of it, but yes.
>
> Q:     Mr. Niederst oversimplified?
>
> A:     Yes, he did, and he missed some critical points but –
>
> Q:     What did he miss?
>
> A:     Well, he missed that – the one that jumps out is he said there was no adhesion promoter in Project 71, and it's in all three [formulations in the family tree].  It's that 23S49, 32S02, and Project 71 all have adhesion promoters.  That's critical to that performance.  Polyesters inherently are weak for adhesion and aggressive in food packs; and in some beverage end they're not strong enough.
>
> Q:     You know a lot about polyesters.
>
> A:     I do know about this technology for beverage end, not a lot; you'd have to define that.  But I know these formulations on – at some level.

(Id. at 146.)   He also demonstrated an ability to remember specific details of the formulations he accessed on November 23, 2011.  (See id. at 125-28.)  Although he claimed to have a poor memory (see id. at 135), the record reflects that Van Kuren has an excellent memory for scientific and technical information.  (See id. at 148-151.)

33.     Van Kuren did not sign a noncompete agreement with Valspar, unlike many other high-level employees who testified during the preliminary injunction hearing.  (Id. at 59; 4/9

Transcript (ECF No. 79) at 114.)  Van Kuren did sign a confidentiality agreement with Valspar while employed there, by which he agreed he would not disclose trade secrets or other proprietary information.  (4/9 Transcript (ECF No. 79) at 114.)  Van Kuren had unlimited access within Valspar's internal computer database to its European and North American packaging coating formulations and polymer formulations, as well as unlimited access to the secured "RX database," which is for the "non-BPA coatings, which are the latest developments."  (3/6 Transcript (ECF No. 77) at 93-99.)  Van Kuren presented himself as only a "middle manager," but he was one of only approximately twenty or twenty-five scientists at Valspar with unlimited access to all formulations within Valspar's North American packaging division.  (4/9 Transcript (ECF No. 79) at 6.)  Thus, although his managerial authority was limited, his technological exposure was substantial.

### F.  Van Kuren's Decision to Leave Valspar and Join Watson Standard

34.     By 2011, Van Kuren had decided to commence looking for employment opportunities outside Valspar because he was dissatisfied with his ability to advance at Valspar. (3/7 Transcript (ECF No. 78) at 202-03; Van Kuren Declaration, Hr'g Ex. P-1, ¶¶ 8-17.)

35.     In May or June 2011, Van Kuren learned that David Grant ("Grant"), a friend and business contact who had previously worked as a salesman at a Valspar supplier, had begun working at Watson Standard.  (3/7 Transcript (ECF No. 78) at 203-04.)  Van Kuren and Grant had maintained contact and talked occasionally; Grant told Van Kuren that he enjoyed the atmosphere at Watson Standard.  (Id. at 203.)  Months later, Van Kuren learned that another old acquaintance, Brian Keefe ("Keefe"), who had previously been his supervisor at Valspar, had joined Watson Standard.  (Id. at 203-04.)  Van Kuren contacted Grant to arrange a meeting with Keefe.  (Id.)

36.     Around October 2011, Van Kuren met with Keefe and Grant (on separate occasions) to learn more about Watson Standard.  (Id. at 204-05.)  Van Kuren told Keefe and Grant that he would be interested in a potential management position with Watson Standard.  (Id. at 202, 205-06.)

37.     In early November 2011, Van Kuren met Keefe and Lore for a dinner interview, and took an after-hours tour of Watson Standard's laboratory facilities.  (Id. at 206-08.)  Around one week later, Van Kuren attended a second dinner interview with Lore and the owners of Watson Standard.  (Id. at 207-08.)

38.     On or shortly before November 16, 2011, Van Kuren received an employment offer from Watson Standard.  (Id. at 208.)

39.     On November 21, 2011, after the parties negotiated and made revisions to the employment offer, Van Kuren accepted and signed it.  (Id.)  Van Kuren wanted to remain on Valspar's payroll until January 2012 in order to receive his year-end bonus, which was estimated to be approximately $16,000.  (Id. at 93, 116-17, 199.)  Van Kuren did not tell anyone at Valspar that he had accepted employment at Watson Standard until January 3, 2012, when he resigned.  (Id.; 4/9 Transcript (ECF No. 79) at 85.)  He continued until his resignation to work on Project 71, a highly sensitive and important research and development endeavor.  (3/7 Transcript (ECF No. 78) at 93-94.)  He knew that he would not have been permitted to continue to participate in Project 71 by Valspar if any Valspar employee knew he had accepted a position at Watson Standard.  (Id.)  He knew that he would have been immediately terminated and escorted from the premises if anyone at Valspar discovered his plans.  (Id.)

40.     Van Kuren is a sincere, hard-working individual, but he demonstrated naiveté and poor judgment in his decision to remain at Valspar after secretly accepting employment at a

competitor. He is devoted to his family and demonstrated a proclivity to make poor decisions for personal financial gain for his family and himself, and a proclivity to make unilateral decisions to conceal information from others to whom it would be material and important. The court discredits Van Kuren's testimony that he believed he was doing the right thing by remaining at Valspar to complete his work on Project 71. The court finds instead that while he felt he could benefit Valspar by continuing to work for it after he accepted the position with Watson Standard, he left at a time that was convenient for him, immediately after he received his year-end bonus, and that his decision about when he would leave Valspar was entirely motivated by his desire to obtain his bonus.

41.     Although Valspar attempted to present sufficient meaningful evidence that Van Kuren copied, retained, or otherwise took with him any proprietary documents or electronically-stored information pertaining to the four trade secrets, it failed to do so. The computer forensics information presented during the evidentiary hearings was inconclusive.

42.     The circumstances surrounding Van Kuren's accessing of the non-Project 71 trade secrets, however, are suspicious. The court discredits Van Kuren's testimony that he accessed those files in an attempt to find wax systems for an unrelated Valspar joint-venture with the University of Florida. (See Id. at 97-98, 124-25.) If Van Kuren had wanted to research those wax systems, instead of retrieving individual formulations from the database one-by-one, he could have simply used the database's search function to look for a particular wax. (Id. at 136.)

43.     The court credits the testimony of James Robinson ("Robinson"), technical director of the food and general package group for Valspar, that there would be no reason for Van Kuren to access the non-Project 71 trade secret formulas if he were looking for waxes. (3/6 Transcript (ECF No. 77) at 87, 105-08.) The two ROPP coatings do not contain a wax

component.  (Id. at 107.)  According to Robinson, chemists who are looking for a particular raw material in the formulation database will run a search for the raw material, which will provide a list of all formulations containing it.  (Id. at 107-08.)

44.　Van Kuren's lack of a credible explanation for his accessing the non-Project 71 trade secrets on November 23, 2011, the timing of the access (only two days after he accepted employment with Watson Standard)—and the coincidence that the non-Project 71 trade secrets involve products in which Watson Standard competes—give rise to a strong inference of impropriety.  Accessing these trade secrets provides a further example of Van Kuren's indiscretion and poor decision-making ability.

45.　On the last day Van Kuren worked at Valspar, December 22, 2011, before announcing his resignation, Van Kuren completely cleaned his office.  (3/7 Transcript (ECF No. 78) at 117.)  By cleaning his office prior to announcing his resignation, Van Kuren presented Valspar with no means of overseeing his destruction or disposal of documentary or electronic materials relating to Valspar's trade secrets.  Although there is no direct evidence that Van Kuren retained documentary or electronic information about the four trade secrets, his decision not to allow Valspar to oversee his transition away from Valspar raises red flags and is an additional example of his poor decision-making with respect to Valspar's proprietary information.

### G.  Van Kuren at Watson Standard

46.　Van Kuren's job description as technical director at Watson Standard provides that he would have "direct[ed] and coordinate[d] new product research and development and maintenance of business activities."  (Van Kuren Job Description, Hr'g Ex. P-17.)  The specific requirements enumerated in the job description indicated he would have managed the business and technical components of research and development at Watson Standard.  (Id.)

47. Van Kuren signed an acknowledgement on January 16, 2012, that he understood that Watson Standard forbade him from retaining, disclosing, using or relying on the proprietary or confidential information of his former employers. (Acknowledgement and Agreement: Use of Confidential Information from Prior Entities, Hr'g Ex. P-34.) Van Kuren acknowledged that he was subject to discipline, including dismissal, for violating those policies. (Id.)

48. It would have been incredibly difficult, if not impossible, for Van Kuren to carry out his job responsibilities as technical director at Watson Standard without relying on his trade secret knowledge, including his knowledge of the four trade secrets, obtained while working at Valspar. (4/9 Transcript (ECF No. 79) at 47-50.) He would have been responsible for the success of the researchers working under him; at times, in order to protect Valspar's trade secrets, Van Kuren would have been required to allow his subordinates to fail rather than provide them the benefit of Valspar's previously conducted research. (Id. at 49.) Because of the trial-and-error nature of the research in this field, Van Kuren, in order not to misappropriate the trade secrets, would have to restrain himself both from directing his chemists toward areas of research he knew to be favorable, and also from preventing them from pursuing areas of research he already knew to be unproductive. (Id. at 49.) Santure testified that his job at Valspar is substantially similar to the role that Van Kuren would have fulfilled at Watson Standard (if on a larger scale), and that he could not imagine any way Van Kuren could fulfill his job responsibilities without relying on his knowledge relating to Valspar's trade secrets. (Id. at 46-47.)

49. Watson Standard is capable of benefitting from and utilizing the technologies in the four trade secrets, especially the non-BPA technology embodied in Project 71. Van Kuren argued that it would be prohibitively expensive for Watson Standard, a small company, to utilize

the trade secret knowledge potentially obtained by Van Kuren. Among other reasons, Van Kuren proposes that "[i]n self-manufacturing polymers and other materials comprising the Project 71 formulation, Valspar uses processes, equipment and expertise that are not known nor available to Van Kuren or Watson." (Def.'s Proposed Findings of Fact &Conclusions of Law (ECF No. 67) at 12.) Van Kuren argues that Watson does not have the experience, technology or resources (a) to manufacture the polymers necessary to make Project 71 technology marketable, (b) to sell and to market coatings in the high volumes likely to be demanded after the successful commercialization of non-BPA, water-borne coating technology (like Project 71), or (c) to conduct the toxicology studies necessary for regulatory approval of the technology.[6] (Id. at 13.) The court notes that Van Kuren's arguments rely in large part upon testimony from his expert witness to the same effect. Based upon review and synthesis of the testimony presented, the court finds that the opinions provided by that witness were overstated and exaggerated the difficulties involved in successfully commercializing Project 71 technology. The court credits the testimony of Niederst that Van Kuren most likely knows the formulation for the Project 71 polymer. (3/6 Transcript (ECF No. 77) at 195-96.) Van Kuren accessed the formulation of a key polymer ingredient[7] for Project 71 on the same afternoon, November 23, 2011, that he accessed the non-Project 71 trade secrets discussed above. (Id.)

50. The parties dispute the extent to which Watson Standard would be capable of toll manufacturing polymers in order to take advantage of Project 71, even if they did have access to Van Kuren's trade secret knowledge. "Toll manufacturing" involves contracting with an outside party to manufacture materials for a fee. (4/18 Transcript (ECF No. 81) at 20; 4/11 Transcript

---

[6] At least one ingredient in Project 71 may require food contact notification approval by the FDA. (3/6 Transcript (ECF No. 77) at 235; 4/18 Transcript (ECF No. 81) at 16-19.)
[7] Van Kuren accessed a formulation—"20S49"—which contained one of the polyester polymers on Project 71's "family tree" which was ultimately combined with a separate polyester polymer as the basis for Project 71. (3/6 Transcript ( ECF No. 77) at 190-91, 195.)

(ECF No. 80) at 36.) Toll manufacturing a polymer would require Watson Standard to supply the formula for that polymer, which would include manufacturing instructions and process conditions, as well as quality control instructions so that the toll manufacturer could conduct quality control on the process. (4/11 Transcript (ECF No. 80) at36.) Lore testified that he has made a business decision on behalf of Watson Standard not to utilize toll manufacturers because he is concerned it would lead to liability on Watson Standard's behalf because Watson Standard would not have absolute control over the manufacturing process, but where it may be expected to oversee (or retain legal responsibility for) the quality-control and raw material specifications. (Id. at 36-38.) Given the race to develop non-BPA coatings and the expressed desire for Watson Standard to grow, the court finds that Watson Standard would likely utilize toll manufacturing under the right business conditions.

51.     The court credits the testimony of Thomas Mallen ("Mallen"), the global director for regulatory affairs and strategic services at Valspar. Specifically, the court credits Mallen's testimony that Watson Standard could use Van Kuren's trade secret knowledge to create a water-borne, non-BPA coating like Project 71 without overly expensive regulatory-compliance testing. (See 4/18 Transcript (ECF No. 81) at 4-8.) Watson Standard could use the technology in a way that did not require compliance with food contact regulations, and if a toxicology study were required, the cost would be substantially lower than suggested by Van Kuren's expert—perhaps as low as $50,000 as opposed to more than $1,000,000. Id.

52.     The court credits the testimony of Michael Sawayda ("Sawayda"), who is responsible for supply chain development for new materials (which involves finding toll manufacturers) at Valspar. (Id. at 19-20.) Sawayda testified that toll manufacturing would not be prohibitively expensive or risky or otherwise prevent Watson Standard from competing in the

water-borne, non-BPA coatings market.  (Id. at 19-28.)  According to Sawayda, the risks associated with toll manufacturing are manageable because the toll manufacturer's customer has every opportunity to oversee the process and to reject defective, toll-manufactured materials. (Id. at 23-24.)  Even Valspar, based on its own internal projections, will be required to rely on toll manufacturing for some of its projected Project 71 sales, with the capacity to produce internally only approximately twenty percent of the polymers it anticipates needing for the project.  (Id. at 25-27.)

53.     The court credits the testimony of Valspar's expert, who testified that Van Kuren's expert was overstating the costs involved and the difficulty associated with toll manufacturing.  (Id. at 61-63.)  Watson Standard would be capable of relying on outside manufacturers to provide viable polymers, in the appropriate volumes, in replicating Project 71. (Id.)  Furthermore, Watson Standard would be capable of replicating and marketing that technology at a competitive price, notwithstanding the size differences between Watson Standard and Valspar.  (Id.)

## II.    Conclusions of Law

### A.  Preliminary Injunction Standard

1.     The court considers four factors in determining whether to grant a preliminary injunction.  A party seeking a preliminary injunction must show:  (1) a likelihood of success on the merits; (2) it will suffer irreparable harm if the injunction is denied; (3) granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) the public interest favors such relief.  Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708 (3d Cir. 2004).

2.     The court will consider each of these four factors in order.

## B. Likelihood of Success on the Merits

3.      With respect to Valspar's likelihood of success on the merits, Valspar filed a one-count complaint alleging misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUTSA"), 12 PA. CONS. STAT. § 5301, *et seq.* PUTSA "displaced Pennsylvania's common law tort for misappropriation of trade secrets, but there is no indication that the statute effected a substantive shift in the definition of 'trade secret.'" Bimbo Bakeries USA, Inc. v. Botticella, 613 F.3d 102, 109 n.7 (3d Cir. 2010).

4.      "A person has misappropriated a trade secret under Pennsylvania law when he acquires knowledge of another's trade secret in circumstances giving rise to a duty to maintain its confidentiality and then discloses or uses that trade secret without the other's consent." Id. at 10 (citing 12 PA. CONS. STAT. § 5302).[8] A court may enjoin the actual or threatened misappropriation of a trade secret. Id.

5.      The court of appeals explained in Bimbo Bakeries that

---

[8] PUTSA indicates that "misappropriation" includes:

(1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(2) disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) used improper means to acquire knowledge of the trade secret;

(ii) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

(A) derived from or through a person who had utilized improper means to acquire it;

(B) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

the relevant Pennsylvania decisions, viewed as a group, suggest that (1) a determination of whether to grant injunctive relief in a trade secrets case and, if so, the proper scope of the relief, depends on a highly fact-specific inquiry into the situation in the case the court is considering and (2) a court conducting this inquiry has discretion to enjoin a defendant from beginning new employment if the facts of the case demonstrate a substantial threat of trade secret misappropriation.

Bimbo Bakeries, 613 F.3d at 113.

6.      With respect to *threatened* as opposed to *actual* disclosure of trade secrets, the plaintiff need not establish that disclosure is "inevitable," but only that it is sufficiently likely to warrant the injunctive relief requested.  Id. at 110-12, 114-15.

7.      Pennsylvania courts look to the following factors to determine whether information is protected as a trade secret: (1) the extent to which the information is known outside of the company's business; (2) the extent to which the information is known by employees and others involved in the company's business; (3) the extent of the measures taken by the company to guard the secrecy of the information; (4) the value of the information to the company and its competitors; (5) the amount of effort or money the company spent in developing the information; and (6) the ease or difficulty with which the information could be acquired or duplicated legitimately by others.  Id. at 109; see also Rohm & Haas Co. v. Lin, 992 A.2d 132, 143 n.4 (Pa. Super. Ct. 2010) ("A trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.").  PUTSA defines a "trade secret" as:

> Information, including a formula, drawing, pattern, compilation including a customer list, program, device, method, technique or process that:

> (1) Derives independent economic value, actual or
> potential, from not being generally known to, and not being
> readily ascertainable by proper means by, other persons
> who can obtain economic value from its disclosure or use.
> (2) Is the subject of efforts that are reasonable under the
> circumstances to maintain its secrecy.

12 Pa. Cons. Stat. § 5302.

8.      Here, there is no dispute that the trade secrets at issue are subject to trade secret

protection. Beyond that, the trade secrets clearly meet the requirements of Pennsylvania law as

set forth above, based upon the testimony and evidence presented at the preliminary injunction

hearings.

9.      In light of the court's factual findings that it would have been incredibly difficult,

if not impossible for Van Kuren to avoid relying on or disclosing Valspar's trade secrets as

technical director at Watson Standard, and in light of Van Kuren's demonstrated ambition and

financial motivations, the court concludes there is a strong likelihood he would have done so.

Thus, Valspar showed a likelihood of success on the merits. As explained more fully below,

because of the highly sensitive and valuable trade secrets at issue—particularly Project 71—and

given Van Kuren's surreptitious acceptance of employment at Watson Standard, as well as his

suspicious accessing of Valspar formulations relevant to Watson Standard's business without

credible explanation, the likelihood of disclosure is sufficiently high to warrant the injunctive

relief previously provided by order of the court. See Bimbo Bakeries, 613 F.3d at 110-12, 114-

15.

### C. Irreparable Harm to Valspar

10.     In light of the nature of the market for non-BPA products in the coatings industry,

the enormous investment made by Valspar, Watson Standard's current attempts to grow

aggressively, and its interest in developing non-BPA technologies, the court concludes that

23

Valspar would suffer irreparable harm if the court had not issued the preliminary injunction. Specifically, there is a substantial threat that Valspar would lose the benefit of its Project 71 research (in terms of market share and business opportunities).

11.     The loss of market share or business opportunities is a type of harm which is difficult to quantify, rendering inadequate the legal remedies available to Valspar if the court did not grant the preliminary injunction, and if Valspar were required to rely on a post-hoc calculation of damages to redress any misappropriation that occurred.  See, e.g., West Penn Specialty MSO, Inc. v. Nolan, 737 A.2d 295, 299-300 (Pa. Super. Ct. 1999) (affirming a district court's determination of irreparable harm where "the record demonstrate[d] that [the defendant's] departure signaled a significant loss of business opportunity and market advantage"); Sheridan Broad. Networks, Inc. v. NBN Broad., Inc., 693 A.2d 989, 995 (Pa. Super. Ct. 1997) ("In the commercial context, the impending loss of business opportunities or market advantages may aptly be characterized as 'irreparable injury' for [the] purpose [of granting a preliminary injunction].").

12.     The inadequacy of a remedy at law is an important consideration in assessing whether harm will be irreparable for the purposes of a preliminary injunction.  See Polaroid Corp. v. Disney, 862 F.2d 987, 1006 (3d Cir. 1988).   Given the current dynamism in the coatings market, misappropriation of the trade secrets involved in this case, particularly with respect to Project 71, would lead to damages which could not be rectified after the fact.  Thus, Valspar would have suffered irreparable harm if not for the preliminary injunction.  The court's determination with respect to irreparable harm would be different if not for the substantial investment made in Project 71, and the potential value of the water-borne, non-BPA technology. In other words, if the non-Project 71 trade secrets were the only trade secrets involved in this

case, the court would not have issued the preliminary injunction.

**D. Countervailing Harm to Van Kuren**

13.     An injunction which prevents Van Kuren from employment causes him harm.
See Bimbo Bakeries, 613 F.3d at 118-19 ("[E]ven a temporary injunction prohibiting someone
from pursuing his livelihood in the manner he chooses operates as a severe restriction on him
that a court should not impose lightly.").

14.     The harm to Van Kuren is warranted here, in order to prevent the even greater
irreparable harm to Valspar.  The harm to Van Kuren is alleviated by provisions in the
preliminary injunction order designed to put Van Kuren in the same financial position he would
have been in had he continued his employment at Watson Standard.  See id.

**E. The Public Interest**

15.     Granting the preliminary injunction in this case was consistent with the public
interest.

16.     The two primary public interests are the public interest in protecting trade secrets,
and the public interest in freedom of contracting between employers and employees.  Id. at 119.
For the reasons set forth above, like the court in Bimbo Bakeries, this court concludes that the
public interest in preventing misappropriation of Valspar's trade secrets outweighs the temporary
restriction on Van Kuren's employment.  Id.

**F. Conclusion**

17.     For the reasons set forth above, upon extensive review of the preliminary
injunction hearings, and the submissions of the parties, and in weighing the equities involved in
this case, the court concluded that Valspar had met its burden of establishing the four factors for
the issuance of a preliminary injunction, which includes protection of the financial interests of

Van Kuren.


By the court,


Dated:   August 9, 2012          /s/ Joy Flowers Conti
                                Joy Flowers Conti
                                United States District Judge